IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MIGLENA ANGEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:04-CV-1498-D |
| VS. | § | |
| | § | |
| THE BOEING COMPANY RETIREE | § | |
| HEALTH AND WELFARE BENEFIT | § | |
| PLAN, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION

Plaintiff Miglena Angel ("Angel") seeks to recover medical benefits under § 502(a)(1)(B) of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), from defendant The Boeing Company Retiree Health and Welfare Benefit Plan ("the Plan"), alleging that the Plan Administrator abused its discretion in denying her claim for expenses incurred for surgery to her temporomandibular joints ("TMJs"). This case is presented for decision on the parties' written submissions and the administrative record.[1]  For the reasons that follow, the court concludes that the Plan Administrator did not abuse its discretion in denying benefits, and it grants judgment in favor of the Plan.

---

[1]As discussed below, see infra § III, Angel requests that the court allow her to present certain oral testimony.  Because the court denies this request, the matter is being submitted entirely on the written administrative record.

I

In 1997 Angel was involved in a motor vehicle accident in which she sustained severe injuries to the left side of her face. She subsequently underwent surgery for a deviated septum related to the accident and two surgeries to her TMJs.  She maintains that these procedures——which the Plan paid in full——resulted in continuing resorptive arthritis and condylar resorption.  Angel argues that the injuries for which she now seeks benefits are related to the 1997 automobile accident.

In July 2001 Larry M. Wolford, DMD ("Dr. Wolford"), requested preauthorization from Regence Blue Shield ("Regence"), the Plan Administrator, to perform additional surgery to Angel's jaw.[2]  He indicated that Angel was referred to him for diagnosis and correction of five problems, including TMJ pain.  The other listed problems were "Bilateral severe resorptive arthritis," "Mandibular hypoplasia and asymmetry," "Maxillary hypoplasia and asymmetry, and "Apertognathia."   App. 1.[3]   Dr. Wolford sought preapproval to

_____

[2]There is no dispute that Angel is a Plan participant.

[3]Citations to "App." are to the administrative record that the Plan filed together with its written submission.   The Plan correctly chose to attempt to comply with N.D. Tex. Civ. R. 7.1(i)(4) when it numbered the pages of the record.  *See* D. Br. 2 n.2 (addressing Plan's decision to follow the local civil rules). It did not, however, always do so accurately, *see infra* note 4, and it did not always cite the appendix in the manner required by Rule 7.2(e), *see, e.g.,* D. Br. 15 (citing "Plan at 44" instead of App. 403).   These deficiencies did not interfere with the court's decisional process or require re-briefing.

perform, *inter alia*, "Bilateral temporomandibular joint condylectomies, debridement, reconstruction and mandibular advancement with custom-made total joint prostheses." App. 1.  He included an evaluation of magnetic resonance imaging ("MRIs") taken of both of Angel's TMJs, in which he stated his impression that she suffered "[s]evere bilateral TMJ degenerative joint disease with probable multiple previous surgeries." *Id.* at 5.  A radiologist's impression based on the MRI was that Angel had "marked deformity of the mandibular condyle" in both her left and right TMJs.  *Id.* at 6.  Dr. Wolford's impression of Angel's left TMJ was "severe resorptive arthritis with mild articular disc displacement."  *Id.* at 3.  His impression of her right TMJ was "arthritis and mild osseous changes with the disc in reasonable position."  *Id.*

Under a heading entitled "Temporomandibular Joint Dysfunction and Myofascial Pain Dysfunction Syndrome (TMJ/MPDS) Treatment," the Plan provides that covered services and supplies for the treatment of TMJ/MPDS are paid at "a constant 50 percent of usual and customary charges, up to a lifetime maximum benefit of $3,500." *Id.* at 396.[4]  The Plan also provides:

---

[4]The Plan failed to number properly the latter portion of the Appendix, which contains 1996 and 2000 editions of the Plan that are each numbered identically.  It is nevertheless clear that the parties refer only to the 2000 edition of the Plan. *See, e.g.,* P. Br. 5.  Indeed, the surgeries and initial denial of benefits occurred in 2000.  Moreover, neither party disputes the relevant Plan edition, and both editions appear to contain generally identical provisions (there are some differences in capitalization and wording in the provisions pertinent to this case).

> *Temporomandibular Joint Dysfunction and Myofascial Pain Dysfunction Syndrome (TMJ/MPDS) Treatment*
>
> The plan covers the following surgical and nonsurgical services and supplies for the treatment of TMJ/MPDS when provided by a physician or dentist:
>
> - Initial diagnostic examinations and X-rays.
> - Follow-up office visits.
> - Surgical procedures and related hospitalizations.
> - Appliances, including night guards, bite plates, orthopedic repositioning devices, and mandibular orthopedic devices.
> - Appliance management, including kinesitherapy, physical therapy, biofeedback therapy, joint manipulation, prescription drugs, injections of muscle relaxants, and therapeutic drugs or agents.
>
> As explained on page 21, the plan payment level for TMJ/MPDS treatment is a constant 50 percent of usual and customary charges, up to a lifetime maximum benefit of $3,500.

*Id.*

In September 2001 Angel contacted Regence to obtain information about Dr. Wolford's preauthorization request, and a Regence representative contacted her in response. The representative advised her that a prosthetic device had been approved. She also advised Angel, however, that "[b]ecause it is related to your TMJ joint, it is going to apply to that benefit and

_____

Accordingly, as do the parties, the court will apply the 2000 edition of the Plan, and all citations to "App." are to that edition.

- 4 -

unfortunately under your plan there is a lifetime maximum of $3,500." *Id.* at 15.

Regence subsequently wrote Dr. Wolford, informing him that "[Angel] has been authorized for coverage of a custom joint prothesis, arch bars and hospital admit/discharge exams. This is in addition to coverage of a CAT scan, maxillary osteotomies, abdominal fat graft, bilateral coronoidectomies, splints, evaluation, and x-rays." *Id.* at 18 (CPT procedure codes omitted). The letter also stated that "[b]enefits will be paid for covered treatment of TMJ/MPDS at 50% of the allowed amount, to a maximum lifetime benefit of $3500." *Id.* In a follow-up conversation between Dr. Wolford's office and Regence to address Angel's request to clarify "which procedures will be going to the TMJ versus medical," *id.* at 20, the Regence representative indicated that Regence would review the matter with its dental consultant, *id.* at 21.

In January 2002 Angel underwent the surgery for which she had sought preauthorization. Dr. Wolford submitted a claim to Regence for $44,900 for the procedures performed on Angel.[5] He attached a discharge summary that stated, *inter alia*, that "[t]he reason for

_____

[5]Although the hospital where Angel's surgeries were performed also submitted a claim to Regence (of which Regence determined that $26,030.49 was Angel's personal responsibility), App. 74, Angel directs the court only to the denial of benefits for claims submitted by Dr. Wolford to Regence, along with various miscellaneous charges. *See* P. Br. 24.

replacing the temporomandibular joints with prosthesis was because of [Angel's] severe resorptive arthritis bilaterally." *Id.* at 47.[6]

In May 2002 Regence issued an explanation of benefits that allocated the bulk of the procedures performed to the TMJ/MPDS Limit and thus allowed only $1,030 in benefits.  The Plan concluded that she had reached the $3,500 lifetime maximum benefits under the TMJ/MPDS Limit for the majority of the expenses submitted and denied benefits for the balance of the charges.  After Regence denied additional benefits, it re-evaluated her claim, including consulting a physician.  It ultimately concluded in a May 9, 2002 explanation of benefits that Dr. Wolford was entitled to $824.00 (80% of $1,030 allowed for surgery).  App. 139.  Angel appealed the determination in May 2002.  In September 2002 Regence issued a second explanation of benefits, allowing $10,935.00 in benefits and determining that $35,650 was Angel's personal responsibility.  In October 2002 Regence issued a third explanation of benefits, allowing $18,835.00 in benefits and concluding that the sum of $27,750 in expenses was Angel's personal responsibility.

Angel appealed the denial of the $27,750 in benefits, submitting, *inter alia*, the operative report, Dr. Wolford's preauthorization letter, and articles written by Dr. Wolford concerning, *inter alia*, treatment of idiopathic condylar resorption

---

[6]The discharge summary was dictated by a dentist who assisted Dr. Wolford in performing the surgery.

of the TMJ in teenage girls.   Regence referred Angel's claim for external review to the independent MAXIMUS Center for Health Dispute Resolution ("Maximus").   In December 2002 a practicing and licensed oral and maxillofacial surgeon on Maximus' external review panel evaluated her claim.   Maximus concluded based on the information and available documentation provided to its consultant "that these services were for treatment of [Angel's] TMJ disease," and "that the primary reason that [Angel] sought treatment was because of severe degenerative disease of the TMJs." App. 295.  It "recommend[ed] that [Regence's] denial of coverage for these services for [Angel] under its major medical benefit rather than its TMJ benefit be upheld." *Id.*  Based on this recommendation, Regence upheld its earlier determination, concluding that the expenses were properly calculable under the medical and TMJ disorder benefits of the Plan, that Angel's TMJ benefit had been expended, and that no futher benefits were available.

In March 2003 Angel filed a second appeal.   Upon review, Regence affirmed the benefits denial.   After filing a third appeal, Angel was granted a hearing before the Regence BlueShield Appeals Committee for Boeing Employees ("Appeals Committee") on July 31, 2003 for final review.[7]   After that hearing, the Appeals Committee rejected her final appeal by August 12, 2003 letter.   This

---

[7]In the administrative record, the Appeals Committee also refers to itself alternatively as Regence BlueShield Boeing Traditional Medical Plan Appeals Committee. *See, e.g.,* App. 355.

litigation followed.

II

A plan participant or beneficiary who is denied benefits under an ERISA plan can sue to recover them. *See* 29 U.S.C. § 1132(a)(1)(B). This court has jurisdiction to review determinations made by an ERISA employee benefit plan, including a health care plan. *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999) (en banc). In conducting this review, a

> plan administrator's factual determinations are always reviewed for abuse of discretion; but its construction of the meaning of plan terms or plan benefit entitlement provisions is reviewed *de novo* unless there is an express grant of discretionary authority in that respect, and if there is such then review of those decisions is also for abuse of discretion.

*Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004).

The Plan maintains that the abuse of discretion standard applies to all aspects of the decision in this case——factual determinations and construction of the meaning of Plan terms and Plan benefit entitlement provisions——because the Plan explicitly vests discretion in the Boeing Employee Benefit Plans Committee ("Boeing Committee") or its delegate to make decisions concerning eligibility for payments under the Plan. Angel acknowledges that the abuse of discretion standard applies to the Plan's factual

determinations.[8]   Her position concerning the standard that
otherwise applies to Regence's decisions, however, is somewhat
unclear.  She acknowledges several times in her written submission
that an abuse of discretion standard applies.  *See*, e.g., P. Br.
17, 26.  Yet she also maintains that ambiguities in the relevant
claim language must be resolved in her favor, and she argues that
"the Plan's decision [is] entitled to little deference because of
procedural irregularities which caused a serious breach of the
[P]lan's fiduciary duty, i[.]e. failure to record [and] transcribe
Plaintiff's treating physician's comments, which was held on the
final appeal of this claim."  P. Br. 3.[9]

The administrative record shows that the Boeing Committee has
the

> exclusive right to interpret the terms of the
> Plan and, exercising its discretion, to
> determine all questions arising under the
> Plan.  The decisions of the Committee are
> final and binding.  Benefits will be paid
> under the Plan only if the Committee decides
> in its discretion that you have met the

---

[8]Her assertions that "[t]he Court must determine whether the
decision to deny benefits was arbitrary or capricious," and that
"[t]he Court will only affirm an administrator['s] decision if it
is supported by substantial evidence," P. Br. 16, can both be read
to apply to the Plan Administrator's factual determinations.  *Cf.*
*Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211,
215 (5th Cir. 1999) ("When reviewing for arbitrary and capricious
actions resulting in an abuse of discretion, we affirm an
administrator's decision if it is supported by substantial
evidence.").

[9]The court addresses *infra* at § III why this argument does not
alter the standard of review.

> eligibility requirements and the service representative has determined that you are entitled to the benefits.

App. 403. Also under the Plan, The Boeing Company "authorizes the Boeing Service Center to administer the Plan and interpret its terms" and "authorizes the claim administrators . . . to interpret the Plan and to decide claim appeals." *Id.* at 361. It provides that Regence administers the Plan. *Id.* at 377. Angel does not dispute that Regence is the Plan Administrator who performed these functions on behalf of the Plan. Accordingly, review of Regence's construction of the meaning of Plan terms or Plan benefit entitlement provisions is reviewed for abuse of discretion. *See, e.g., MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 478 (5th Cir. 2003) ("Where a plan administrator has been vested with the discretionary authority to interpret a benefit plan, a district court reviews the administrator's interpretations only for abuse of discretion.").

"In reviewing a plan for abuse of discretion, the district court first must determine whether the administrator's interpretation is legally correct; if it is not, the court must decide whether the decision was an abuse of discretion." *Id.* at 481 (citing *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1131 (5th Cir. 1996); *Pickrom v. Belger Cartage Serv., Inc.*, 57 F.3d 468, 471 (5th Cir. 1995)). The court assesses three factors to determine whether the interpretation is legally correct: (1) whether Regence has

given the Plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the Plan; and (3) any unanticipated costs resulting from different interpretations of the Plan. *Id.*; *Wildbur v. Arco Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992).[10] If "the fiduciary's interpretation of the plan was legally correct, the inquiry is over, pretermitting any need to consider whether a legally incorrect interpretation of the fiduciary was not an abuse of discretion." *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 270 (5th Cir. 2004).

Regarding the plan fiduciary's factual findings, "[t]he law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny . . . benefits." *Id.* at 273. "If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Id.*

"'[R]eview of the administrator's decision need not be particularly complex or technical; it need only assure that the administrator's decision falls somewhere on a continuum of reasonableness——even if on the low end.'" *MacLachlan*, 350 F.3d at 478 (quoting *Vega*, 188 F.3d at 297).

The Plan asserts in its opening brief that Regence "has no financial interest in the Plan." D. Br. 1 n.1. Angel does not

---

[10]The court is permitted to skip this first part if it can determine that the decision was not an abuse of discretion. *MacLachlan*, 350 F.3d at 481.

argue in response that Regence operated under a conflict of interest. Had she intended to make this argument, it was her burden to do so. *See MacLachlan*, 350 F.3d at 479 ("The degree to which a court must abrogate its deference to the administrator depends on the extent to which the challenging party has succeeded in substantiating its claim that there is a conflict."); *Watermann v. Murphy Oil USA, Inc.*, 1998 WL 273117, at *5 (E.D. La. May 27, 1998) (allocating to plaintiffs burden of establishing that plan administrator acted under conflict of interest).[11] Accordingly, the court need not apply a sliding scale standard or reduce the amount of deference to Regence in deciding whether it abused its discretion in denying benefits in this case. *Cf., e.g., MacLachlan*, 350 F.3d at 478 ("Where, however, an administrator's decision is tainted by a conflict of interest, the court employs a 'sliding scale' to evaluate whether there was an abuse of discretion."). Even if the court assumes *arguendo* that the record is sufficient of itself to establish "a minimal basis for a conflict" of interest, the court "review[s] the decision with 'only a modicum less deference than [it] otherwise would.'" *Id.* at 479 (quoting *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 343 (5th Cir. 2002)).

---

[11]As noted above, Angel does argue that the Plan Administrator's decision is entitled to little deference because of procedural irregularities related to the failure to transcribe the July 31, 2003 appeal hearing. The court addresses this argument below.

III

The court must decide as a threshold matter whether to permit Angel to present the oral testimony of Dr. Wolford.

A

When Angel filed her written submission, she also filed a motion in which she requests that the court allow oral testimony from Dr. Wolford.  She contends that there is no record of the July 31, 2003 conference call, which represented the last stage in the appeal process and that involved her, her prior counsel, Dr. Wolford, and the Appeals Committee.  She maintains that this is the only conversation in which her treating physician participated, that he is the only person who could provide details of the actual nature of the procedure performed on her jaw and whether it was related to the TMJ/MPDS exclusion on which the Plan relies to deny benefits, and that the Plan did not transcribe the conversation so that the court and she could review the most important conversation related to the denial of benefits.  In her written submission, she posits that the court should address why the record contains numerous recorded conversations and documents regarding Angel's condition but lacks a recording of the July 31, 2003 conference and documentation related to the conversation, including the contents and comments regarding her condition.  Angel requests that the court address this question in determining the standard of review

and the necessity of oral testimony from Dr. Wolford.[12]  She argues that neither she nor the court is able to refer to statements that occurred during the conference call because it was not transcribed. Angel posits that judicial review is limited to the record developed before the claim administrator unless there are procedural irregularities, and, due to the failure to transcribe Dr. Wolford's comments, little deference should be given to Regence's decision.

B

"A long line of Fifth Circuit cases stands for the proposition that, when assessing factual questions, the district court is constrained to the evidence before the plan administrator." *Vega*, 188 F.3d at 299 (collecting cases).  "Once the administrative record has been determined, the district court may not stray from it except for certain limited exceptions." *Id*.  The court may also consider evidence of "how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim." *Estate of Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 215 F.3d 516, 521 (5th Cir. 2000) (citing *Vega*, 188 F.3d at 299).

---

[12]Angel's motion and written submission are somewhat inconsistent.  Her motion requests that the court allow her to introduce testimony from Dr. Wolford.  In her written submission, she asks that the court allow testimony from Angel, her prior counsel, and Dr. Wolford.

"The plan administrator has the obligation to identify the evidence in the administrative record and the claimant must be afforded a reasonable opportunity to contest whether that record is complete." *Id.* at 521 (citing *Vega*, 188 F.3d at 295, 299; *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201-02 (5th Cir. 1997)).[13] Significantly, although the Plan was obligated to afford Angel a reasonable opportunity to contest whether that record was complete, she was obligated to present her corrections to Regence before she filed suit.

Although *Vega* discusses the following principles in a somewhat different procedural framework—submission of additional information that the administrator did *not* consider—its reasoning applies equally to the present procedural framework—a claimant's contention that information the administrator *did* consider was not adequately included in the administrative record for the claimant's use and the court's review. *Vega* teaches that the applicable

_____

[13]The Fifth Circuit has rejected concerns about relying on plan administrators to compile the administrative record.

> Although we recognize that there is a concern that a self-interested administrator can manipulate this process unfairly (e.g., by permitting the administrator to exclude from the record information that would weigh in favor of granting the claim), we think that this concern is largely unwarranted in the light of adequate safeguards that can be put in place.

*Vega*, 188 F.3d at 300.

- 15 -

procedural rules should "encourage the parties to resolve their dispute at the administrator's level." *Vega*, 188 F.3d at 300. Accordingly, "[b]efore filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it." *Id*. "If the claimant submits additional information to the administrator . . . and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record." *Id*. This is not "a particularly high bar to a party's seeking to introduce evidence into the administrative record." *Id*. "[T]he administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Id*. "[I]n restricting the district court's review to evidence in the record, we are merely encouraging attorneys for claimants to make a good faith effort to resolve the claim with the administrator before filing suit in district court . . . ." *Id*.

In the context of today's case, *Vega*'s reasoning dictates that Angel's counsel should have prepared and submitted to the Plan her version of what Dr. Wolford stated during the July 31, 2003 conference and requested that it be made part of the record. His opinions and factual explanation could have been contained in an

affidavit or declaration.   The Plan would then have had the
opportunity to review the submission, evaluate whether it was
accurate, and perhaps agree to its accuracy or include its own
version.[14]  Any dispute concerning the accuracy of Angel's version
would have been joined at the administrative level, before filing
suit in district court.

Moreover, were Dr. Wolford permitted to testify now, it would
appear to violate this command of *Vega*:

> In the light of our precedent and the abuse of
> discretion standard . . ., we will not permit
> the district court . . . to consider evidence
> introduced to resolve factual disputes with
> respect to the merits of the claim when that
> evidence was not in the administrative record.
> We therefore stand by our precedent and
> reaffirm that, with respect to material
> factual determinations—those that resolve
> factual controversies related to the merits of
> the claim—*the court may not consider evidence
> that is not part of the administrative record*.

*Id.* (emphasis added).

Nor does Angel's argument justify altering the standard of
review.   *Vega* insists on procedural rules that "encourage the
parties to resolve their dispute at the administrator's level"
because Supreme Court precedent requires that the court "apply an

---

[14]For example, the Plan questions in its reply brief whether
Dr. Wolford even participated in the Appeals Committee telephone
conference, as Angel maintains.  *See* D. Reply Br. 6.  This is the
type of dispute that should be addressed at the administrative
level.  *See Vega*, 188 F.3d at 302 n.13 ("we have made plain in this
opinion that the claimant only has an opportunity to make his
record before he files suit in federal court").

abuse of discretion standard of review." *Id.* at 300.  The standard of review does not change, therefore, based on challenges to the administrative record.

Accordingly, Angel's motion for oral testimony of her treating physician is denied.

IV

The court now turns to the merits of Angel's claim.

A

Angel contends that Regence limited her coverage based on the broad and undefined terms "TMJ and MPDS" in the Plan.  P. Br. 19. She maintains that the terms were construed to her detriment, in violation of the principle that policy language is to be construed in favor of the insured.  *Id.* (citing *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 538-39 (9th Cir. 1990)).  Further, she asserts that limitation on "any" treatment of the TMJ is in "direct conflict with numerous provisions of the Plan which provide medical coverage to the 'jaw.'"  P. Br. 15-16.  Finally, she urges that "there exists no documentation that [her] condition was related to TMJ/MPDS."  *Id.* at 26.

Angel has devoted a substantial part of her brief to an attempt to analogize her case to *Combe v. La Madeleine, Inc.*, 2002 WL 31496373 (E.D. La. Nov. 6, 2002).  In *Combe* the district court denied an ERISA plan administrator's motion for summary judgment, holding that it had abused its discretion in denying coverage for

TMJ-related surgery. *Id.* at *7.   The plan had set a lifetime maximum benefit of $1,000 for treatment of TMJ "syndrome," which it defined, *inter alia*, as the "treatment of jaw joint disorders . . . related to the temporomandibular joint." *Id.* at *4-*5.   The court observed that the medical literature submitted explained that "TMJ syndrome is somewhat of a nebulous concept that can manifest itself via a litany of symptoms." *Id.* at *5.   Relying on the opinion of the claimant's treating physician——the only medical expert to address the treatment provided in the case——the court concluded that the claimant was not treated for TMJ syndrome. *Id.*   It also held that, although "the definition of TMJ contained in the Plan is conceivably broad enough to encompass" the plaintiff's treatment, it was an abuse of discretion to deny coverage. *Id.* at *6.   The court found the examples of the type of treatments encompassed in the lifetime maximum coverage and the purpose of the limit to avoid open-ended exposure were inapplicable to plaintiff's surgery for a specific diagnosis. *Id.* (distinguishing claimant's surgeries from those performed for TMJ syndrome and concluding, *inter alia*, that "the surgeries Plaintiff endured are unlike any of these listed treatments in both severity and invasiveness" and finding that claimaint's surgery was for specifically diagnosed failure of rib grafts she received several years before, which  court had already concluded was not for TMJ syndrome).

In the instant case, the Plan maintains that its limitation on

coverage is not restricted to TMJ syndrome, as in *Combe*, but rather encompasses TMJ "dysfunction." It posits that the TMJ/MPDS Limit is thus "cause neutral," and it is immaterial whether the treatment afforded is for the purpose of repairing a TMJ injury or treating a TMJ disease. D. Reply Br. 10. The Plan points to record evidence that the treatment for which Angel sought coverage was for her TMJs generally. And it urges that dysfunction should be given its plain and ordinary meaning of "impaired or abnormal functioning." *Id.* at 9. Together, it asserts, "TMJ dysfunction" has an ordinary meaning and Regence correctly applied the Limit to the services Dr. Wolford provided.

B

The court first determines whether Regence's interpretation of the Plan is legally correct; if it is not, the court must decide whether the decision was an abuse of discretion. *See Maclachlan*, 350 F.3d at 481. As noted above, the court assesses three factors to determine whether the interpretation is legally correct: (1) whether Regence has given the Plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the Plan; and (3) any unanticipated costs resulting from different interpretations of the Plan. *See Wildbur*, 974 F.2d at 638.

Germane to the first factor, the evidence in the record indicates that, in 1993, another Plan participant sought coverage for arthritis in several joints——one of which was the TMJ——even

though he was not suffering from TMJ disease.   In reviewing the identical TMJ/MPDS Limit, the claim representative noted: "I feel that the intent of this specific benefit was to put a limit on the treatment of TMJ disease rather than on medical treatment of the TMJ joint for medical reasons such as arthritis."  App. 111.  This position was rejected, however, because a memorandum was issued directing all Boeing Service Representatives that "treatment of the TM joint for any condition (including medical) is paid to the TMJ benefit."  App. 109.  According to the memorandum, "all treatment of the TM joint, regardless of diagnosis or etiology, is paid to the TMJ benefit of 50%, $3,500.00 lifetime maximum."  *Id.*  Angel cites no contrary record evidence that shows that Regence has not consistently interpreted the Plan to apply the TMJ/MPDS Limit to treatment of the TMJ, regardless of causation.[15]

Regarding the second factor, the Plan provides limited coverage for "Temporomandibular Joint Dysfunction and Myofascial Pain Dysfunction Syndrome (TMJ/MPDS) Treatment."  App. 396.  The Plan urges a reading of this limitation that is "causation neutral," i.e., it is immaterial whether the dysfunction resulted

_____

[15]Angel notes that the Plan previously paid in full two prior TMJ procedures related to her 1997 car accident.  Assuming *arguendo* that it did, such payments are not inconsistent with the Plan's present decision because the Plan contains a specific provision that addresses accidental injury, *see* App. 33, and the Plan could have determined that all the services for which it provided benefits on a prior occasion were related to her automobile accident.

from disease or trauma or a combination of both.  What is pertinent
is whether the participant received services for TMJ "impaired or
abnormal functioning," i.e., impaired or abnormal functioning of
the TMJ.  Angel posits that the failure to define "TMJ/MPDS" is
"fatal" to the Plan.  She also alleges that the Plan's
interpretation runs afoul of other provisions that afford coverage
to treatment for the jaw.  She points to a provision, under a
heading titled "Dental Repair of Accidental Injury," that it
"covers services and supplies when provided for the prompt repair
of natural teeth or other body tissues as a result of an accidental
injury.  This may include surgical procedures of the jaw . . . ."
P. Br. 5 (quoting App. 392); *see also* App. 392 (providing coverage
for oral surgery, including excision of tumors, cysts, and
exostoses of jaw); *id.* at 387 (providing coverage for, *inter alia*,
prostheses to replace missing body parts, including necessary
repair and replacement required by normal usage or change in
patient's condition).

     The court holds that Regence's interpretation of the TMJ/MPDS
Limit is fair.  Notwithstanding the Plan's failure to define the
term "Temporomandibular Joint Dysfunction," it is not ambiguous.
*Compare Kunin*, 910 F.2d at 541 (concluding that term "mental
illness" in ERISA plan was ambiguous).  The TMJ is a specific
joint, and dysfunction has a plain (if broad) meaning: impaired or
abnormal functioning.  *See Vercher*, 379 F.3d at 229 n.8 (holding

that courts interpret ERISA plans in "an ordinary and popular sense as would a person of average intelligence and experience") (internal quotation marks omitted). Moreover, the term "syndrome," which is defined as "[t]he aggregate of symptoms and signs associated with any morbid process, and constituting together the picture of the disease," Stedman's Online Medical Dictionary, www.stedmans.com, applies to the term "Myofascial Pain Dysfunction," not to the term "Temporomandibular Joint Dysfunction." *See* App. 380. Thus while it might be reasonable to construe the TMJ/MPDS Limit to apply only where myofascial pain dysfunction is caused by a disease rather than, for instance, an accident, the same is not true for "Temporomandibular Joint Dysfunction."

Angel's contention that Regence's interpretation is contradicted by other Plan provisions also lacks merit. The provisions she cites concerning accidental injury and oral surgery are specific, either in the circumstances in which they provide coverage or in the types of treatments that are covered. They therefore supersede more general provisions and apply even when the TMJ/MPDS Limit may appear to circumscribe available coverage. *See Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (warning against applying general provision when doing so would undermine limitations created by more specific provision). For example, surgery to remove a tumor from the jaw would not fall within the

TMJ/MPDS Limit where it was covered by the more specific provision governing tumor excisions of the jaw. *See* App. 392.  Likewise, it would not be unreasonable for Regence to conclude that, although the Plan covers prostheses generally, *see id.* at 387, the more specific TMJ/MPDS Limit applies to TMJ prostheses, *see id.* at 380. And surgery to the jaw that might be limited as a general matter would be covered when necessitated by an accidental injury.

Angel also relies on the preapproval by Regence's physician consultant.  In response to Regence's request that the physician review documentation to "determine possible coverage" of "custom made joint prostheses," App. 9, he concluded that "necessity is documented for total joint replacement – TMJ Concepts is an approved prosthesis." *Id.*  This approval, however, only addresses whether Plan benefits are payable; it does not say definitively that payable benefits are or are not subject to the TMJ/MPDS Limit. A procedure can be covered under the Plan but still be restricted by a lifetime benefit cap.

Concerning the third factor, the court concludes that the Plan would face unanticipated costs if, for instance, the TMJ/MPDS Limit were interpreted to apply only when treatment was required because of TMJ disease.  A requirement that the Plan pay for procedures to the TMJ necessitated by a wide array of causes would trigger unanticipated costs because it can be fairly inferred that, when Boeing adopted the Plan, it thought it was capping such expenses at

a relatively modest lifetime limit.[16]    This inference is corroborated by the part of the Plan that addresses "Benefit Payment Levels and Maximums."  *See* App. 377.  It pointedly notifies participants that the Plan generally pays covered services in full, except for only two "special provisions," one of which is "Temporomandibular joint dysfunction and myofascial pain dysfunction syndrome (TMJ/MPDS) treatment."[17]    *Id.* at 378. Moreover, given the occurrence of a claim in 1993 for coverage that exceeded the limit, it is not a speculative possibility that the Plan would face such unanticipated costs.

Accordingly, the court concludes that Regence gave the Plan its legally correct meaning because it gave the Plan a uniform construction, the interpretation is consistent with a fair reading

---

[16]*Combe* suggests why such limits may be viewed as desirable by ERISA plans.

> Moreover, the nebulous nature of TMJ syndrome, as explained in the literature that forms a part of the record, elucidates why the La Madeleine plan basically singled out TMJ syndrome for a specific lifetime maximum of $1,000.00. As the literature explains, there are very few "definites" where treatment for TMJ syndrome is concerned.  *Without a limitation, the Plan could have open-ended exposure to an endless list of potential treatments making it impossible to cover costs.*

*Combe*, 2002 WL 31496373, at *6 (emphasis added) (addressing TMJ syndrome).

[17]The other is "Mental Health and substance abuse treatment." App. 378.

of the Plan, and the interpretation avoids unanticipated costs.

C

Alternatively, even if the court were to hold that Regence's interpretation was incorrect, it would still decide that Regence did not abuse its discretion in reaching this conclusion.  Three factors are important in this analysis: (1) the internal consistency of the Plan under Regence's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith.  *See Wildbur*, 974 F.2d at 638.

First, as discussed *supra* at § IV(B), Regence's interpretation is internally consistent.  Second, Angel does not contend that the Plan's interpretation fails to follow any government regulations.  Third, apart from her contention that the Plan seriously breached its fiduciary duty by failing to transcribe the July 31, 2003 Appeals Committee hearing——an assertion that she has not preserved in this court——Angel has not alleged, much less established, that Regence or the Plan acted in bad faith.  The record shows that Regence adjusted her claim several times, increasing the benefits, and in doing so consulted an in-house physician and an external health dispute resolution center, Maximus.  Maximus consulted a practicing and licensed oral and maxillofacial surgeon on its external review panel, who also concurred in allocating the

expenses to the TMJ/MPDS Limit.  The record reflects that Regence
engaged in a good faith review of Angel's claim.

D

The court now decides whether Regence's factual findings are
supported by substantial evidence.  This court must uphold the Plan
Administrator's decision if it is.  *See Meditrust Fin. Servs. v.
Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) ("When
reviewing for arbitrary and capricious actions resulting in an
abuse of discretion, we affirm an administrator's decision if it is
supported by substantial evidence.").  For the factual findings to
be supported by substantial evidence, there need only be a rational
connection between the known facts and the decision or between the
found facts and the evidence.  *See id.* ("A decision is arbitrary
only if 'made without a rational connection between the known facts
and the decision or between the found facts and the evidence.'"
(quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d
822, 828-29 (5th Cir. 1996)).

Angel asserts at several points in her brief that her treating
physician never indicated, alluded, or opined that the procedures
to be performed were related to TMJ/MPDS treatment.  She also
maintains that she supplied no medical documentation to the Plan
that alluded to the fact that she was suffering or had been
diagnosed with TMJ or MPDS.  Although Regence was obligated to
consider Dr. Wolford's findings and opinions, *see Black & Decker*

- 27 -

*Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."), his opinion was not entitled to greater weight merely because he was Angel's treating physician, *see id.* at 825 (holding that rule adopted by Commissioner of Social Security for use in determining entitlement to disability benefits in social security case that gave special weight to treating physician's opinion did not apply to plan administrators making disability determinations in ERISA case).  Regence was also permitted, as it did here, to consider other evidence in deciding the nature of the procedures and of her medical condition and whether they fell within the Plan's legally correct interpretation of the TMJ/MPDS Limit.  Nor is it dispositive, as Angel asserts, that no examining physician has stated that any of these procedures is related to TMJ/MPDS.  This concept, like that of the treating physician, appears to be derived from social security disability jurisprudence, which does not control.  Moreover, this court must uphold Regence's factual findings if they are supported by substantial evidence, which may come in a number of forms, including the opinion, as here, of a consulting oral and maxillofacial surgeon.

Angel also argues that in Regence's conversation with Dr. Wolford's office assistant——which she complains Regence should have undertaken with a retained physician or her treating physician——the

assistant never mentioned the words TMJ/MPDS.  Instead, the office assistant "provided that [Angel's] condition was not related to the TMJ because [she] has a pathology of the condyle and the condyle resorping."  P. Br. 10.[18]

Angel asserts that she was never diagnosed or treated for a disease of her TMJs or TMJ syndrome, as the plaintiff in *Combe* argued.  *See* P. Br. 18 ("[T]here exists no physician who has diagnosed [Angel] with TMJ/MPDS, nor do any of the surgical reports provide that [her] diagnosis is related to [TMJ/MPDS]."); *see also* App. 278 ("Regence made no consideration of [Angel's] unusual diagnosis which are separate and distinct from TMJ syndrome . . . .").

The court holds that substantial evidence supports Regence's finding that the procedures Dr. Wolford performed were for TMJ dysfunction.  It is beyond dispute that Dr. Wolford performed surgery on Angel's jaw joints, i.e., her TMJs.  He did not do so for cosmetic purposes, as Angel emphasizes in her brief.  That means he performed the procedure to ameliorate a medical problem—here, impaired or abnormal functioning of the TMJ. Moreover, there is ample evidence in the record from which to find that the surgery was for the specific purpose of treating degeneration of her TMJs and problems that arose therefrom.  *See,*

---

[18]"Condyle" is "[a] rounded articular surface at the extremity of a bone."  Stedman's Online Medical Dictionary, www.stedmans.com.

*e.g.,* App. 5 (Dr. Wolford's description of his impression from reviewing Angel's MRI from July 2001 as "[s]evere bilateral TMJ degenerative joint disease with probable multiple previous surgeries"); App. 6-7 (radiologist's description of "marked deformity" in both left and right TMJs); App. 42 (surgical report describing Angel's operation as, *inter alia*, "[b]ilateral temporomandibular joint condylectomies, debridement, reconstruction, and mandibular advancement with custom made total joint prosthesis" necessitated by "Bilateral severe resorptive arthritis"). Accordingly, there is substantial evidence that Dr. Wolford treated Angel's TMJ dysfunction.

It is not clear from the record that the Plan ever determined the cause of Angel's TMJ abnormalities or that she was being treated for TMJ syndrome. Indeed, the Plan asserts that the cause of Angel's TMJ-related problems is immaterial to its determination that the TMJ/MPDS Limit applied. The court thus need not determine whether Regence abused its discretion in determining that her treatment was for TMJ disease or syndrome.

In sum, the Plan Administrator's factual findings concerning the nature of Angel's treatment are supported by substantial evidence.

V

Angel seeks an award of attorney's fees.  Because Angel failed to establish her entitlement to benefits, the court finds that the factors articulated in *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980), do not favor an award of fees. Accordingly, the Court denies Angel's request for fees and costs. *See Lain*, 279 F.3d at 343, 347-48 (noting discretionary nature of fee award under ERISA).[19]

\*     \*     \*

For the reasons stated, the Plan is entitled to judgment in its favor, and a judgment dismissing this action will be filed today.

April 11, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[19]It appears from the Plan's reply brief that it does not now seek an award of attorney's fees but will request them under Fed. R. Civ. P. 54(d)(2) if it has grounds to do so.  The court therefore need not address such a request at this time.

- 31 -